UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

XEROX CORPORATION,            )
                             )
            Plaintiff,        )
                             )
v.                           )
                             )        No. 3:06-0434
LARRY O'DOWD individually, and )      JUDGE ECHOLS
in his capacity as President and )
CEO of DIGITAL DOCUMENT SYSTEMS, )
INC., and DIGITAL DOCUMENT    )
SYSTEMS, INC.,                )
                             )
            Defendants.       )

## MEMORANDUM

Pending before the Court is Plaintiff Xerox Corporation's ("Xerox's") Motion for Preliminary Injunction (Docket Entry No. 13), to which the Defendants, Larry O'Dowd, individually and in his capacity as President and CEO of Digital Document Systems, Inc. ("O'Dowd"), and Digital Document Systems, Inc. ("DDS") have responded in opposition.

Xerox filed its Complaint for Temporary Restraining Order, Preliminary and Permanent Injunctions, and Damages on April 28, 2006. In the Complaint, Xerox brings claims for misappropriation of trade secrets against O'Dowd and DDS (Count 1); unfair competition against DDS (Count 2); breach of contract with respect to confidential information against O'Dowd and DDS (Count 3); tortious interference with business relationships against O'Dowd and DDS (Count 4); inducement to breach a contract under T.C.A.

1

§ 47-50-109 against O'Dowd and DDS (Count 5); breach of contract with respect to trademarks against DDS (Count 6); trademark infringement against DDS (Count 7); conversion against O'Dowd and DDS (Count 8); unjust enrichment against DDS (Count 9); account stated against DDS (Count 10); breach of contract with respect to dealer account and unpaid invoices against DDS (Count 11); breach of contract for failure to disconnect or change telephone lines against DDS (Count 12); and breach of contract for failure to add message to telephone lines against DDS (Count 13).

The same day the Complaint was filed, District Judge Aleta A. Trauger denied Xerox's motion for a temporary restraining order. (Docket Entry No. 10). Xerox then moved for a preliminary injunction. (Docket Entry No. 13). On October 18, 2006, following a period of expedited discovery, the Court held a hearing on the Motion for Preliminary Injunction.

## I. FACTS

O'Dowd was employed by Xerox for over fourteen years. In 2000, O'Dowd resigned his management position, and with his partner Robert Briggs, formed a company known as IBS, which became an authorized agent and dealer for Xerox in certain counties in Tennessee and Georgia. (Pl. Ex. 19; Howell Aff. ¶¶ 6-7.) In April 2002, Briggs' association with O'Dowd ended, and O'Dowd continued as a Xerox agent and dealer through his company, DDS. (Id. at ¶ 7.) Xerox and DDS entered into a Business Relationship Agreement

2

in 2002 (Pl. Exs. 2 & 6), and, pursuant to the Authorized Sales Agent Schedule (Pl. Exs. 3 & 4), over the next few years DDS's territories expanded to cover substantial portions of Tennessee, Kentucky, Indiana and Georgia. By virtue of these agreements, DDS became a large independent Xerox sales agent and dealer with high visibility. (Howell Aff. at ¶ 8.)

The Business Relationship Agreement set forth DDS's obligations with respect to Xerox's confidential and proprietary information for a period of five (5) years after communication of such information to DDS.[1] Section 8.1 of the Agreement also

---

[1] Section 8.1 of the Agreement provided:

> **Confidential Information.** Business Associate may from time to time have access to or receive directly from Xerox information and materials that are designated as confidential or proprietary or which are by their nature confidential, proprietary, or sensitive ("Xerox Confidential Information"). This Xerox Confidential Information may concern present or future Xerox products, business strategies, or End Users. Business Associate shall hold Xerox Confidential Information and any additional information developed through its use in confidence, shall not use it except to further its relationship with Xerox and/or achieve sales on Xerox' behalf, and shall not disclose them to third parties unless authorized in writing by Xerox. . . . Business Associate's obligations under this Section shall survive the termination (including any non-renewal) of this Agreement.

(Pl. Ex. 2.)

3

required DDS to obtain executed Non-Disclosure Agreements from its employees who have access to Xerox Confidential Information.[2]

Xerox provided DDS with confidential and proprietary information concerning existing Xerox customers and information about prospects within DDS's assigned territories. In addition to marketing and training materials, Xerox provided DDS with access to Xerox's MarketSmart database, which is Xerox's comprehensive, on-line system for accumulating, updating, and managing its customer and sales cycle management information. The MarketSmart database

---

[2]The Non-Disclosure Agreements provided in part:

2. Neither Employee nor Agent Owner shall communicate Xerox Information to any third party and shall use its best efforts to prevent inadvertent disclosure of Xerox Information to any third party. This provision shall survive the termination of Employee's employment (or working relationship) with Sales Agent; Agent Owner's affiliation with Sales Agent; and/or Sales Agent's affiliation with Xerox.

3. Neither Employee nor Agent Owner shall use Xerox Information nor circulate it within its own organization except to the extent necessary for its provision of services as an Employee or Agent Owner of Sales Agent in furtherance of Sales Agent's efforts on behalf of Xerox.

4. All materials including, without limitation, documents or data furnished to Employee or Agent Owner by Xerox or Sales Agent that are designated in writing to be the property of Xerox, or which by their nature would be considered to be Xerox proprietary information or property of Xerox, shall remain the property of Xerox and shall be returned to Xerox promptly at its request with all copies made thereof.

(Pl. Ex. 5.)

4

includes: (1) the identities of Xerox customers and prospects; (2) customer and prospect contact information; (3) notes entered by sales representatives concerning their contacts with customers and an automated calendaring system for follow-up calls; (4) Dunn & Bradstreet reports relative to customers and prospects; (5) UCC-1 filings of competitive equipment; (6) prospecting tools, and (7) pricing information. From the MarketSmart database, a sales representative can also print Historical Machine Profiles ("HMPs"), which list customers' equipment, pricing, lease status, usage, service histories, users and contact information.[3] (Pl. Ex. 16.)

Only Xerox agent/owners have access to MarketSmart through assigned user IDs and passwords. Xerox dealers are not given access to MarketSmart. The initial MarketSmart screen includes a "PRIVACY AND SECURITY NOTICE" which states:

> This is a Xerox computer system that is "FOR OFFICIAL XEROX USE ONLY" by specifically authorized personnel and includes Xerox confidential, proprietary and privileged information. This system may be subject to monitoring. No expectation of privacy is to be assumed. Unauthorized attempts to upload, download or change information on this system are strictly prohibited and may be punishable under applicable law. Individuals found performing unauthorized activities are subject to disciplinary action including termination, and criminal and civil prosecution.

(Pl. Ex. 21.)

---

[3]Testimony indicates that a high percentage of the business establishments listed in MarketSmart have not actually purchased Xerox equipment, (Docket Entry No. 85-1, Hamilton Depo. at 92), and that MarketSmart contains outdated or inaccurate information. (Docket Entry No. 90-1, Harris Depo. at 36.)

The business relationship between Xerox and DDS began to fray in the Fall of 2005. Xerox managers believed that DDS was not meeting its sales goals and that two serious policy violations had occurred. As a result of communications with Xerox management about these issues, O'Dowd, on behalf of DDS, signed agreements terminating DDS territories in Bowling Green, Kentucky, and Nashville, Tennessee. O'Dowd felt pressured to give up the lucrative Nashville territory, especially after he had invested substantial resources in developing the market for Xerox.

Also in September 2005, Sharp representatives approached O'Dowd and DDS about becoming an authorized agent and dealer for Sharp. Following a series of meetings and telephone calls, O'Dowd and DDS executed an agreement to become a Sharp agent and dealer during the second week of December 2005. (Docket Entry No. 87-1, O'Dowd Depo. at 109-122.)

O'Dowd notified Xerox by letter dated January 13, 2006, that DDS wished to immediately terminate its Business Relationship Agreement with Xerox. (Pl. Ex. 7.) Bill Howell, Xerox Business Development Manager for the Central Region, heard rumors on January 16, 2006 that DDS had entered into an agreement with Xerox's direct competitor, Sharp. Howell immediately telephoned O'Dowd, who admitted that he had entered into a business relationship with Sharp, but he denied DDS had already sold Sharp equipment. (Pl. Ex. 19, Howell Aff. ¶ 16.)

6

The same day, Xerox terminated DDS's access to MarketSmart,[4] and O'Dowd sent an email to all DDS employees directing them to return all Xerox material in their possession to Chrystal Wallace or Scott Hamilton for return to Xerox. (O'Dowd Depo., Ex. 4.) About this same time, O'Dowd instructed Lou Goldblatt and Christina Dyer, DDS IT employees, to attempt to locate and immediately delete any files on DDS computers that appeared to be downloads from Xerox or a Xerox database. (Docket Entry No. 23 O'Dowd Second Aff. ¶ 18.) According to Dyer, she and Goldblatt began using BCWipe software to "wipe" the hard drives of DDS's computers. (Dyer Depo. at 30-32.) Goldblatt testified, however, that DDS routinely had been using BCWipe every two weeks to "whitewash" computer hard drives after he found a compromising photo of someone on a computer, but O'Dowd instructed him to stop the practice after O'Dowd was served with this lawsuit in May 2006. (Goldblatt Depo. at 36-39.)

In a letter dated January 24, 2006, Xerox agreed to immediate termination of its relationship with DDS. (Pl. Ex. 9.) The letter stated in part:

> Xerox will make arrangements to remove all Xerox owned demonstration equipment currently in [DDS's] possession. In addition, please note that the terms of the Agreement obligate [DDS] to return all other Xerox property in its possession or control.

---

[4]MarketSmart access at DDS's Nashville office had been previously terminated on December 31, 2005. (Docket Entry No. 90-1, Harris Depo. at 58.)

As per Section 8.1 of the Agreement, [DDS] is obligated, among other things, to (a) hold Xerox Confidential Information and any information developed through its use in confidence, (b) not use any such information for any purpose except to further its business relationship with Xerox and/or achieve sales on behalf of Xerox, and (c) not disclose any such information to third parties unless authorized to do so in writing by Xerox.

(Id.)

The parties hotly dispute whether DDS, in December 2005, in anticipation of the termination of its business relationship with Xerox, downloaded from Xerox's MarketSmart database substantial, if not massive, amounts of Xerox's confidential and proprietary information for use in DDS's sales activity on behalf of Sharp.

Xerox presents evidence that the owners and managers of DDS (O'Dowd, Tom White, Scott Hamilton[5] & Scott Davidson) intended to take Xerox's information from the MarketSmart database and use the information to make sales as a Sharp agent and dealer. (Hamilton Depo. at 22-24.) According to Scott Hamilton's testimony, Lou Goldblatt and Christina Dyer downloaded the information from MarketSmart to Excel format, and then uploaded the information into Microsoft CRM to create a new marketing database for DDS. (Id. at 23-27.) Hamilton discussed the download with O'Dowd, White, Davidson, Goldblatt and Dyer, and Goldblatt told him when the conversion of the information was achieved. (Id. at 98-99.)

_____

[5]Scott Hamilton and Tayra Bright left DDS in March 2006, and their agency, Advanced Document Solutions ("ABS"), became the Xerox agent and dealer in Louisville, Kentucky.

Hamilton did not see or use any CRM database at DDS before DDS held a training session on the new CRM database in late January or early February of 2006. (<u>Id.</u> at 82-83.) The CRM database included information on Xerox models, serial numbers, copy volumes and payments, which Hamilton believed came from the MarketSmart database. (<u>Id.</u> at 102.)

Hamilton supervised DDS's offices in Louisville and Lexington, Kentucky. After DDS sent its termination letter to Xerox, Hamilton returned marketing literature and posters to Xerox, but, in consultation with O'Dowd, he kept all of the customer files. (<u>Id.</u> at 32-33.) No one from Xerox called him and asked about the location of the customer files. (<u>Id.</u> at 71-72.) Hamilton was also aware that DDS scanned customer documents and kept electronic files of the documents. (<u>Id.</u> at 39.) After DDS's relationship with Xerox ended, DDS used information taken from MarketSmart, the retained customer files, and other sources to solicit Xerox customers for Sharp. (<u>Id.</u> at 37.)

Hamilton's testimony is corroborated by the testimony of former DDS sales representative Matt Rodgers.[6] (Docket Entry No. 88, Rodgers Depo; Pl. Ex. 17, Rodgers Aff.) Rodgers learned how to download information from MarketSmart into Excel on his personal laptop computer when he worked at a Xerox agency in California.

---

[6]Rodgers is currently Xerox's agent and dealer in Knoxville, Tennessee, where DDS is located.

9

When Christina Dyer asked Rodgers, at O'Dowd's request, to show her how to download information from MarketSmart in December 2005, Rodgers did so. (Id. at 27, 31-36, 79.) O'Dowd told Rodgers that "they were dumping MarketSmart," and when Rodgers asked what he meant, O'Dowd told him "we're moving to a new customer management tool." (Id. at 102.) Goldblatt told Rodgers that Rodgers would be able to access Xerox customer numbers, lease expirations, and print volumes on the new CRM database. (Id. at 104.) Rodgers' understanding was that Goldblatt and Dyer put in a lot of work hours to download information from MarketSmart into Excel format, and Kerry Hofstetter assisted by helping to transform the Excel columns into usable format. Two or three temporary workers were brought in to help with the conversion in late December 2005. Goldblatt and Dyer ultimately succeeded in transferring the MarketSmart information, even though the Excel format made it difficult to upload data into CRM. (Id. at 43-46.)

Rodgers had conversations with a number of DDS managers and employees about the downloading, and the fact that the database conversion occurred was not a secret. Tom White essentially told Rodgers that DDS was going to use Xerox's MarketSmart database to sell Sharp products. (Id. at 47-57, 110.) Rodgers also saw Chrystal Wallace, office administrator, print out HMPs from MarketSmart in December 2005 and place them in notebooks. (Id. at 62-65.)

10

Rodgers kept his personal notes about his contacts with Xerox customers and was not asked by anyone at DDS to return that information to Xerox. (Id. at 72.) Before leaving DDS in late January 2006, Rodgers tried to sell Sharp products to customers who were already involved in the process of purchasing a Xerox machine. (Id. at 82-83.) After leaving DDS and becoming the Xerox agent/dealer in Knoxville, Rodgers learned of incidents which led him to believe that O'Dowd and DDS sales representatives were trying to solicit Xerox customers to sell them Sharp products. (Id. at 85-87.)

Tayra Bright testified she knew the MarketSmart database contained Xerox's proprietary information, and it was information that other competitors did not have. DDS's CRM database contained the same information included in MarketSmart. (Docket Entry No. 81, Bright Depo. at 27, 33.) When she and other sales representatives asked during a sales kickoff meeting in January 2006 how they were going to get customer information without MarketSmart, she was told, "Tayra, rest assured, it's fine. We've got it." (Id. at 60, 96.) Everyone was "just kind of chuckling." (Id. at 63.) Bright testified she knew that Lou Goldblatt, Christina Dyer, and Matt Rodgers were in charge of the database conversion, and that they only had a certain amount of time to retrieve the information from MarketSmart. (Id. at 60-61, 108.)

Bright tried to solicit one Xerox customer for Sharp before she left DDS in March 2006. (Id. at 45-46.) Before leaving DDS, she printed out computer screen shots showing specific Xerox information for two different customers in the CRM database. (Pl. Ex. 15.) She did this because she knew MarketSmart was to be used only for Xerox's purposes, and she knew "it was against the law to take it." She intended to use the printed CRM screen shots as leverage if O'Dowd did not live up to his salary agreements. (Id. at 63-65.) After she left DDS and became part owner of the Louisville Xerox agency with Scott Hamilton, she took all of her Xerox customer files with her, as they had not been previously returned to Xerox. (Id. at 30, 44, 87, 101.)

DDS salesman David Gideon testified he learned from Matt Rodgers that MarketSmart data was transferred to CRM, and Gideon saw temporary workers at the DDS offices at the end of December 2005. (Docket Entry No. 83-1, Gideon Depo. at 41, 44, 50-51, 79, 139-142.) The day Gideon left DDS, he signed a non-disclosure agreement at O'Dowd's request which stated: "You further acknowledge that from the time DDS left Xerox and moved to Sharp starting in January 2006, no one at DDS has provided you with Xerox private data, including HMPs, MarketSmart data, or any other list of data known to be considered Xerox private information." (Id. at 83 & Depo. Ex. 3.) Gideon knew that, at the time DDS supposedly

12

returned proprietary materials to Xerox, customer files were not packed up and sent back. (<u>Id.</u> at 59-60, 147.)

O'Dowd, Goldblatt, and Dyer flatly deny that they downloaded any information from MarketSmart for transfer into DDS's CRM database to use in generating sales for Sharp. (Docket Entry No. 87-1, O'Dowd Depo. at 75, 128; O'Dowd Second Aff. ¶¶ 20, 26; Docket Entry No. 84-1, Goldblatt Depo. at 34-35, 82; Docket Entry No. 24, Goldblatt Aff. ¶ 7; Docket Entry No. 82, Dyer Depo. at 43; Docket Entry No. 25, Dyer Aff. ¶ 7.) O'Dowd denied that he logged into MarketSmart, except during a couple of Xerox training classes. (O'Dowd Depo. at 292.) He further testified that he bought customer lists in 2000 and 2001, and he and his sales representatives generated customer information from a wide variety of sources that could not be put into MarketSmart because Xerox would not allow any updates. (O'Dowd Depo. at 94-97.) Records produced by telemarketers hired by DDS, as well as records from other sources of information, were kept on Excel spreadsheets and integrated into CRM. (<u>Id.</u> at 99-100, 146.) O'Dowd denied knowing why temporary employees were working at DDS in late December 2005. (<u>Id.</u> at 227.)

Goldblatt denied knowledge of what the MarketSmart database looks like, and stated he could not tell anyone how to find anything in the MarketSmart database. (<u>Id.</u> at 35.) He stated that Matt Rodgers showed him Excel spreadsheets, and Rodgers boasted

13

that he knew how to take Xerox's data. Goldblatt was not aware of anyone else who could export data from MarketSmart. (Id. at 57-59, 61.) Goldblatt testified the earliest version of the CRM database was developed in the summer of 2005, and it was upgraded using CRM 3.0 in mid- to late-April 2006, when all information was loaded back onto a new server following the crash of the CRM server in March 2006. (Goldblatt Depo. at 24, 28-29, 44-46.) DDS's dealer database, which included Xerox customer information, was integrated into CRM at the time of the upgrade.[7] (Id. at 88.)

Dyer denied that she had ever accessed MarketSmart, that she had ever logged on to MarketSmart or that she had ever been given a password for MarketSmart. (Dyer Depo. at 43.) She denied downloading or converting the MarketSmart database herself or watching anyone else do it. (Id. at 46-47.) She denied looking at MarketSmart to determine what fields of information were contained there when developing the CRM database. (Id. at 96.)

Dyer testified Matt Rodgers showed her an Excel spreadsheet on his laptop computer and stated, "This is my database," but Dyer was busy at the time, so she glanced at Rodgers' laptop only briefly.

---

[7]O'Dowd testified, however, that the dealer database was not integrated into CRM until about a month and a half before his deposition taken on October 4, 2006, (O'Dowd Depo. at 133), which would place that integration at approximately mid- to late-August. Additionally, although Goldblatt testified DDS's CRM server crashed in March 2006, just before the CRM 3.0 upgrade was done, (Goldblatt Depo. at 41-44), Chrystal Wallace testified that DDS's server crashed a year and a half ago. (Wallace Depo. at 103.)

14

Dyer denied that she knew the Excel spreadsheet Rodgers showed her contained MarketSmart data. (Id. at 45-46.) Dyer also denied that Hofstetter assisted her or Goldblatt in converting the MarketSmart data. (Id. at 49.) She further testified the CRM software upgrade took place in the second or third week of April 2006. (Id. at 52.) According to Dyer, temporary employees were hired in December 2005 to pack up Xerox materials. (Id. at 60.)

DDS office administrator Chrystal Wallace testified she rarely used MarketSmart or CRM, she had no reason to access MarketSmart in late December 2005 or early January 2006, she had no knowledge of how information was put into CRM, and she denied knowing why temporary employees were working at DDS in late December 2005. (Docket Entry No. 91-1, Wallace Depo. at 22-23, 82-84, 85-87, 95.)

The denials of these DDS witnesses stand in stark contrast to Xerox's evidence that over a period of one month, from December 2, 2005, through January 10, 2006, DDS exported 585,659 lines of information from MarketSmart (id. at ¶ 7), in comparison to only 23,893 lines of information DDS exported from MarketSmart over a period of four months, from July 25, 2005, through December 1, 2005. (Pl. Ex. 18, McKechney Aff. at ¶ 6.) The MarketSmart access logs show that someone using the password assigned to Chrystal Wallace logged into MarketSmart a total of 222 different times; someone using the password assigned to Denise Corum accessed MarketSmart a total of 144 different times; someone using the

15

password assigned to Paul Linehan exported to Excel 26,714 lines of data between December 20, 2005 and December 28, 2005; and someone using the password assigned to Jim Harris exported to Excel 1,939 lines of data from December 22, 2005 through December 28, 2005. (Id. at ¶ 8.)

Xerox's expert, Glenn Perdue, testified at the preliminary injunction hearing that the native log data of MarketSmart showed DDS's overall log-in trend to MarketSmart was on a steady decline between mid-July 2005 and mid-January 2006 with average reporting activity of 9,354 lines per week. However, the "SA" log-in trend increased dramatically starting the week of November 27, 2005 through the end of the year. Six "SA" user accounts were assigned to O'Dowd, which allowed him full access to all territory information for each particular "SA" log-in. A spike in the reporting use of MarketSmart along with an increase in "SA" log-in activity occurred while O'Dowd was beginning his business relationship with Sharp, but before he terminated his business relationship with Xerox. During the weeks of November 27 to December 3, 2005, December 18 to December 24, 2005, and December 25 to December 31, 2005, "SA" log-in reporting activity sharply increased to hundreds of thousands of lines of MarketSmart data, with over 250,000 lines of data accessed in each of the last two weeks of the year. This reporting activity was twenty-four (24) times greater than that for DDS's standard week. Moreover,

16

seventy-seven percent (77%) of DDS's reporting activity for the year occurred during the three weeks mentioned. (Pl. Exs. 11-12; Pl. Ex. 22, Ex. 3 (color copy).)

Perdue also testified that mirror images of the hard drives of DDS's computers were recently obtained. In analyzing data concerning the CRM database, Perdue considered Goldblatt's testimony that the CRM database, using version 1.2, was first implemented in the Summer of 2005. Version 1.2 did not allow deletion of custom fields; however, version 3.0 does. Perdue compared the screen shots Tayra Bright produced from the CRM database in March 2006 with the same customer screen shots after the CRM 3.0 upgrade occurred. This comparison showed that the user defined fields that existed in the 1.2 version implementation were deleted in the 3.0 version implementation. An action of this type would typically be performed by a person with "System Administrator" rights.

Perdue also learned that the CRM 3.0 upgrade actually occurred on May 20, 2006, a few weeks after DDS was served with this lawsuit, not in April 2006, as Goldblatt and Dyer testified. Further, Perdue explained that data on the CRM server showed the server was in service as early as January 23, 2006, contrary to Goldblatt's and Dyer's testimony that the CRM server crashed in March 2006 and was thrown in the garbage, and a new server was put into service. (Pl. Exs. 13-14.) Data taken from DDS's computer

17

hard drives revealed that BCWipe had been used to scrub the hard drives before and after this lawsuit was filed, even up to the day before the mirror images of some hard drives were taken. Additional pertinent information is contained in Perdue's Preliminary Expert Analysis. (Pl. Ex. 22.)

Paul Linehan, a DDS salesman at the Chattanooga office, admitted that when he received calls from Xerox customers after mid-January 2006 he told them that he was with Sharp and tried to sell them Sharp equipment. (Docket Entry No. 86-1, Linehan Depo. at 55-56, 78-80.) Xerox customer Randall Wallace attests that Tom White and Christie Helm of DDS tried to sell him Sharp products in November 2005. (Pl. Ex. 20, Wallace Aff. ¶ 11.) Moreover, in March or April 2006, a DDS representative called on Wallace to solicit for Sharp and already knew his company's data, including contact name and phone number, and the type of printing and copying machine the company used. (Id. at ¶ 12.)

According to O'Dowd, as of October 4, 2006, DDS had sold 120 Sharp machines to 48 customers since January 2006. Five or six of the 48 customers had Xerox agent equipment. (O'Dowd Depo. at 123-124.)

## II. STANDARD OF REVIEW

In determining whether Xerox has established a right to preliminary injunctive relief, the Court must consider four factors: (1) whether Xerox has sufficiently established a

18

reasonable likelihood of success on the merits; (2) whether Xerox may suffer irreparable harm if the injunction is not granted; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction on the public interest. See Tucker v. City of Fairfield, 398 F.3d 457, 461 (6th Cir. 2005).

Similarly, under New York law[8] a preliminary injunction may issue if the moving party establishes: (1) it will suffer irreparable harm absent an injunction and (2) either (a) a likelihood of success on the merits or (b) the existence of sufficiently serious questions going to the merits to make them fair ground for litigation, and (3) the balance of hardships tips decidedly in the applicant's favor. See North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43 (2d Cir. 1999).

### III. ANALYSIS

### A. Xerox's likelihood of success on the merits

The Court concludes that Xerox has shown a likelihood of success on the merits at least as to its claims for misappropriation of trade secrets against O'Dowd and DDS (Count 1); unfair competition against DDS (Count 2), and breach of contract with respect to confidential information against O'Dowd and DDS (Count 3).

---

[8]Section 8.8 of DDS's Business Relationship Agreement with Xerox contained a provision selecting New York law to govern disputes arising from the Agreement.

19

To succeed on a claim for misappropriation of trade secrets, Xerox must show (1) it possessed a trade secret, and (2) the defendants "used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." <u>Haber</u>, 188 F.3d at 43. A trade secret is defined as "'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" <u>Id.</u> at 44 (quoted cases omitted). The aggrieved plaintiff need not show that the information it seeks to protect is vital to its business, but only that the information would provide the unauthorized user with an unfair competitive advantage which it otherwise would not have enjoyed. <u>Computer Assocs. Int'l, Inc. v. Bryan</u>, 784 F. Supp. 982, 987 (E.D.N.Y. 1992). In determining whether the matter at issue is protectable as a trade secret, courts often examine the method by which the Defendant acquired the information, such as by stealing or copying it. <u>Id.</u>

In deciding whether information constitutes a trade secret, New York courts have considered the following factors: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount

20

of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Haber, 188 F.3d at 44. A customer list developed through substantial effort and kept in confidence may be treated as a trade secret and protected against disclosure to a competitor so long as the information it contains is not otherwise readily ascertainable. Id. Whether a customer list is a trade secret is generally a question of fact. Id.

The Court determines on the evidence presented that a reasonable factfinder could decide that specific Xerox customer information stored in Xerox's MarketSmart database constitutes a trade secret. Information specific to Xerox's customers, such as contact information, models and serial numbers of Xerox equipment purchased, notes entered by Xerox or its sales representatives concerning contacts with the customers, Dunn & Bradstreet reports relative to specific Xerox customers, UCC-1 filings of competitive equipment, lease status, pricing information, usage, and service histories, is not generally known outside of Xerox, and such information is divulged to Xerox employees and agents under strict conditions. The information is not shared with Xerox dealers. O'Dowd and DDS executed Xerox agreements in which they acknowledged the confidential and proprietary nature of the information and agreed to return such information at the conclusion of the business

21

relationship. Xerox takes numerous security measures to guard the secrecy of the information and prevent its replication because the information is very valuable to Xerox and its competitors.

Testimony revealed that Xerox has spent millions of dollars developing and maintaining its MarketSmart database. This fact is relevant to the extent Xerox has expended significant resources in compiling and protecting information about its own customers. The Court notes, however, that any business can purchase lists of prospective customers, as both Xerox and DDS have done. Such information about prospective customers that is purchased on the open market cannot constitute a trade secret. See Bryan, 784 F.Supp. at 988 (observing matters of public or general knowledge in industry are incapable of being designated as trade secrets).

Xerox will likely be able to show successfully on the merits that O'Dowd and DDS misappropriated Xerox's trade secrets. The evidence shows a dramatic spike in DDS's "SA" log-in usage of MarketSmart at the end of 2005, just as DDS was signing on as a Sharp dealer and concluding its relationship with Xerox. The computer data and witness testimony indicates that O'Dowd, or employees working at his direction, exported hundreds of thousands of lines of data from MarketSmart into Excel format and then Goldblatt and Dyer uploaded the information into CRM, despite the protestations of O'Dowd, Goldblatt, and Dyer that this did not occur. Evidence also shows that Xerox's trade secrets were used by

22

DDS representatives in attempting to gain business for Sharp. Consequently, the Court concludes that Xerox has shown a likelihood of success on the merits of this claim.

Based on the same analysis, the Court concludes that Xerox has shown a likelihood of success on the merits of its unfair competition claim. See Bryan, 784 F.Supp. at 988. "'[E]ven where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee for use in his future business or employment is to be enjoined as unfair competition[.]'" Id. (quoted case omitted). See also Roy Export Co. v. Columbia Broadcasting Co., 672 F.2d 1095, 1105 (2d Cir. 1982) (observing unfair competition claim ordinarily concerns taking and use of plaintiff's property to compete against plaintiff's own use of the same property). The evidence indicates that O'Dowd and DDS have misappropriated Xerox's confidential and proprietary information to use that same information to compete against Xerox as the agent and dealer for Sharp.

Finally, the Court concludes that Xerox likely will prevail on the merits of its claim for breach of contract as it relates to confidential and proprietary Xerox customer information. The record establishes that O'Dowd and DDS did not return customer files and other proprietary data to Xerox upon the conclusion of

23

their business relationship, as O'Dowd and DDS agreed to do in the contracts they executed with Xerox.

**B.  Xerox's showing of irreparable harm**

"A trade secret once lost is, of course, lost forever[,]" and the loss is not measurable in monetary damages.  <u>FMC Corp. v. Taiwan Tainan Giant Indus. Co.</u>, 730 F.2d 61, 63 (2d Cir. 1984). Under New York law, irreparable harm is presumed where a trade secret has been misappropriated.  <u>Lumex, Inc. v. Highsmith</u>, 919 F.Supp. 624, 628 (E.D.N.Y. 1996).

The Court concludes that Xerox has made a sufficiently adequate showing of irreparable harm to warrant a preliminary injunction.  Not only does the evidence show that Defendants have taken Xerox's confidential and proprietary information without authorization and in violation of their agreements, but that DDS sales representatives have already used that information in efforts to sell Sharp products to customers, including Xerox customers.  In fact, O'Dowd testified that his company had been successful in selling some Sharp equipment to Xerox customers.[9]  There is also some indication in the evidence that DDS representatives may be

_____

[9]Although at the time the Motion for Preliminary Injunction was filed, Xerox also sought an injunction requiring DDS to (1) return "green files" containing customer information and (2) install telephone messages properly directing Xerox customer calls to Xerox, it appears from the present record that these matters have been resolved by the parties and are no longer a subject for injunctive relief.

providing customers with misleading information that detrimentally affects Xerox. As a result of such competing sales activity by DDS, Xerox will lose goodwill and business opportunities that cannot be measured in monetary damages alone. The Court concludes that Xerox has made a showing of irreparable harm. See Estee Lauder Companies Inc. v. Batra, 430 F.Supp.2d 158, 175-177 (S.D.N.Y. 2006).

## C. The balance of hardships

The balance of hardships tilts clearly in favor of Xerox. The hardship that issuance of a preliminary injunction will impose on O'Dowd and DDS is the necessity to compete for Sharp without the use of Xerox's confidential and proprietary information. Failure to issue an injunction, however, will permit O'Dowd and DDS to continue to utilize Xerox's protected information in an unauthorized manner to the disadvantage of Xerox in violation of law and the Business Relationship Agreement.

## D. The impact of an injunction on the public interest

This factor is satisfied because the public has a strong interest in discouraging unfair trade practices such as conversion of trade secrets and unfair competition. See Hoover Transp. Servs. v. Frye, 77 Fed. Appx. 776, 785 (6th Cir. 2003).

## IV. CONCLUSION

For all of the reasons stated, the Court concludes that Xerox's Motion for a Preliminary Injunction should be GRANTED. The Court will require Xerox to post a surety bond in the amount of $ *300,000* as security for the preliminary injunction under Federal Rule of Civil Procedure 65.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

*Oct. 26, 2006 at*
*12:20 pm.*